## Case No. 6,288.

### HAZLETT et al. v. CONRAD.

[1 Dill. 79.] [1]

Circuit Court, W. D. Missouri. 1870. [2]

ADMIRALTY—COLLISION — SIGNAL LIGHTS — LOOKOUTS, ETC.

1. In a case of collision between an ascending and descending steamer on the Ohio river, both were held to be in fault, and the damage divided according to the rule in admiralty.

2. The respondents' vessel was adjudged to be in fault because out of her proper place in the river when the collision occurred, and because she had no licensed pilot and no proper lookout; and the libellant's vessel was found to be in fault because her signal lights were not in proper places, and because she had no lookout as required by law, and because her master was not at his post, but away from it without cause.

3. The testimony relating to the foregoing facts stated and effect considered by Krekel, J.

4. Signal lights hung on each side of the boat on nails driven into the nosing of the hurricane roof are not in their proper place, since the derricks and spars would necessarily obstruct the view of them in certain directions.

5. The pilot house in the night time, especially when it is very dark, and the view obstructed, is not the proper place for the lookouts to be stationed.

6. Masters of vessels are not proper lookouts.

7. A commander of a steamer who, after hearing the whistle of an approaching vessel, goes below on deck to look after freight without any justifying reason, *held* to be in fault where a collision occurs before his return to his post.

[Cited in The Manitoba, Case No. 9,029.]
[See The Albemarle, Case No. 135.]

Appeal from a decree in admiralty of the district court for the Eastern district of Missouri, pronounced by Treat, J.

---

[1] [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission.]

[2] [Affirmed in 154 U. S. 584, 14 Sup. Ct. 1168.]

[This was a libel by Hiram K. Hazlett and others against Peter Conrad.]

The case was one of collision between an ascending and descending steamer on the Ohio river. Respondents appeal from the decree, which found both steamers to be in fault, and divided the damages, and insist that the libellants' boat was solely to blame.

Sharp & Broadhead, for libellants.
Rankin & Hayden, for respondents.

Before DILLON, Circuit Judge, and KREKEL, District Judge.

KREKEL, District Judge. Libellants, owners of the steamer Katie, bring this action against respondents, owners of the steamer Des Moines, to recover damages growing out of a collision which occurred on the 22d day of November, 1864, in the Ohio river in the chute between Diamond Island and the Indiana shore, by which the Katie was sunk and became a total loss. The libel charges the fault of the collision on the Des Moines. The answer of respondent denies that the Des Moines was in fault, and charges the fault on the Katie, in this, that she had no signal lights, did not answer signals, that she was not in her proper place in the river, and that she made no effort to avoid collision. Damages done to the Des Moines by the collision are claimed by respondent. The court below found both steamers in fault, referred the case to commissioners to ascertain and report the damage caused to each vessel by the collision, divided the amount ascertained between them, and rendered a decree accordingly. [Case unreported.] From this decree of the district court respondent appeals.

A preliminary question as to plaintiff's right to sue has been raised on the hearing, and on looking into the record the court finds that libellants have made out a prima facie case of ownership, one at least which, unrebutted, entitles them to maintain this action.

Passing to the merits of the case it is found that on the night of the day mentioned, the Katie was on a voyage on the Ohio river from Evansville to Nashville, and met the Des Moines on her way from Nashville to Louisville, loaded with troops. It was a starlight night, and objects could be seen a half mile at least. The pilot of the Des Moines testifies that, running up the Indiana shore, and within forty or fifty yards of it, he discovered something in the river above him which he could not make out, but he sounded his whistle for the larboard or Indiana side, received no answer, stopped his engines in due time, and backed them when danger of a collision became imminent. About the time the headway of the Des Moines had run out, and while backing, the collision took place, and the Katie received the injury causing her total loss.

For the Katie it is testified that the Des Moines was seen a half mile off, or more,

coming up the Indiana shore, that the Des Moines blew her whistle for the larboard or Indiana shore, that the signals were promptly answered by the Katie for the larboard or Kentucky shore.

The witnesses for the Des Moines testify that they did not see signal lights on the Katie, nor hear any answer to signals of the Des Moines. The witnesses for the Katie testify that her lights were up, fastened to the nosing of the hurricane roof on each side, and that an officer of the Des Moines took one of them down after the collision. The captain of each steamer seems to have been on watch without any other lookout.

The witnesses for the libellants all testify that the collision took place about two hundred to three hundred yards from the Indiana shore, and near the middle of the chute. It is manifest that no collision could have taken place if the Des Moines had been within forty or fifty yards of the Indiana shore and the Katie from two hundred to three hundred yards out in the river, as the witnesses testify. An examination of the wounds given and received will, however, help to solve the problem, and lead to conclusions justifying the decree.

The Katie received her injury on her starboard, near the gangway; the Des Moines hers near the bow or stem, and towards the larboard. In order thus to give and receive the injury one or the other of the boats must have been quartering to the current. The Des Moines according to the testimony is found running within forty or fifty yards of the Indiana shore, and a boat to strike her on the stem and the larboard must have been still nearer the shore. To place the Katie in such a position and quartering the river would have put her stern against the bank, a position which none of the witnesses assign her. Again, it is testified that, at the time of the collision, the Des Moines' headway had run out and she was backing her wheels, and that the blow swung her round quartering to the current. If the position of the Des 'Moines had been forty or fifty yards from shore, she would inevitably have struck the bank—a matter to which no one testifies. The Des Moines received her injury at the stem and to the larboard, which would be the case if she ran into the Katie as testified to by the witnesses for the Katie. It is certain that the collision did not take place near the Indiana shore as testified to by the witnesses of respondent, but it is highly probable, if not certain, that it took place one hundred and fifty to two hundred yards from the shore.

This being the case, the Des Moines was not in her proper place in the river, the channel, according to the testimony, being along the Indiana shore, for which she, as the ascending boat, had signaled. The Des Moines, not being in her proper place in the river, and failing to justify her position where found, must be held in fault. She was also in fault in not having a licensed pilot.

It seems that the Des Moines was in the employment of the government, and running from Cairo to Nashville. Shortly before the collision she was at Nashville, and was there ordered by the quartermaster to take troops to Louisville. Her pilots were licensed to run between Cairo and Nashville, and when she arrived at Smithland, at the mouth of the Cumberland, an unsuccessful effort was made to obtain pilots to Louisville, and she proceeded, with a pilot not licensed for that part of the Ohio river, to Louisville.

The nature of the employment of the Des Moines does not clearly appear. The evidence leaves it in doubt whether the government had the entire control of the vessel, or whether it merely directed the use of her with the consent of the owner who was her master, and on board as such. The question of compulsion is, therefore, not before the court.

The Des Moines was also in fault in not having a proper lookout, of which more is said hereafter when speaking of the faults of the Katie. But the Katie was also in fault. Her signal lights were hung on each side, on nails driven into the nosing of the hurricane roof. This was an improper place for carrying signal lights, for the derricks and spars would necessarily obstruct the view of them in certain directions. When the Katie was built she had a crane attached to her chimney to carry signal lights, but one of the horns of the crane being broken, she afterwards carried her lights as stated. The rules of navigation require signal lights to be so arranged as to show a uniform and unbroken light.

The Katie was also in fault in not having a lookout stationed in proper place. In The Ottawa, 3 Wall. [70 U. S.] 268, the supreme court of the United States says that: "Steamers are required to have constant and vigilant lookouts stationed in proper places on the vessel, and charged with the duty for which lookouts are required, and they must be actually employed in the performance of that duty. Proper lookouts are competent persons, other than the master and helmsman, properly stationed for that purpose on the forward part of the vessel; and the pilot house, in the night time, especially when it is very dark, and the view is obstructed, is not the proper place. In general, elevated positions, such as on hurricane deck, are not as favorable situations as those more usually selected on the forward part of the vessel, nearer the stem." Id. 273, per Clifford, J.

In the first place, the masters of both vessels acted as lookouts while in charge of, and navigating, their vessels. They were not proper lookouts, nor were they stationed in the proper place for lookouts. No other lookouts appear to have been on either steamer. Besides this the master of the Katie says that when he heard the whistle of the steamer, he stepped out of the cabin, heard the answering signals of the Katie, and, seeing the

approaching steamer a good way off, he went to look after some cattle, on board as freight, and before he got back the steamers had collided. Thus the Katie was left without a commander or lookout at the very time when they were both, as events showed, sadly needed. The Katie, for want of a proper lookout, and for the conduct of her officers, must be held in fault.

It is charged that the Katie was also in fault in making no effort to avoid a collision when the danger had become imminent. It is very difficult to say what should have been the action of the Katie under the circumstances. The Des Moines seems, either for the purpose of crossing over to the Kentucky shore, or on account of unskillful navigation, to have suddenly come into the course of the Katie. It may have been a question difficult to determine by those navigating her whether to go ahead, or to back her, was the best means of escape from danger. This in all probability being the case with those handling the boat, the court will not undertake, from the evidence, to approve or condemn the action taken.

In the sense of the law, under the term faults for which a party is held responsible, is included, not only willful misconduct, but the neglect of any proper precaution to avoid collision, and want of care, vigilance, or skill, in the management of a vessel. Proceeding under this definition, and the facts of the case, the court finds that the Des Moines, by being out of her proper place in the river when the collision occurred and failing to account for her position, must be found in fault. [Waring v. Clarke] 5 How. [46 U. S.] 441, 465. She had no licensed pilot navigating her at the time of the collision, and is therefore in fault. See act of congress of August 30, 1852 [10 Stat. 61], and rules and regulations. She had no lookout as required, and is therefore in fault. The Ottawa, 3 Wall. [70 U. S.] 268.

The Katie was also in fault. She did not have her signal lights in proper position, and was therefore in fault. She had no lookout, as is required, and in this respect was in fault. Her master was not in his proper place, but, on the contrary, was in a very improper place at the time of the collision, and she was on that account in fault.

Both vessels being in fault, the court below properly had the damages done to both ascertained, and, under the rule of law, divided the damages between them. There is nothing in the objections raised to commissioner's report as to the finding of damages done, and the objections are overruled. The decree of the district court is in all respects affirmed, and a decree will be entered accordingly. Decree affirmed.

[The respondent then appealed to the supreme court, where the decree was affirmed in an opinion by Mr. Justice Davis, who said that when the ascending boat, having given two whistles, was hit on the port bow, and the other boat was injured on the starboard bow, there is convincing evidence that the ascending boat was at fault. 154 U. S. 584, 14 Sup. Ct. 1168.]

NOTE.—In the case of Fredericks v. The McPorter [unreported], on appeal from the Eastern district of Missouri, at the April term, 1871, before Dillon and Krekel, JJ., in which Messrs. Rankin & Hayden were proctors for the libellant, and Mr. Moreau, for the claimant, it was decided, affirming the decree of Treat, J., that where a barge was seaworthy, and properly moored, a steamer having a tow, being free to move, was responsible for damages caused by collision with the barge. The question whether, when a vessel is properly landed and moored, her unseaworthiness would, in any case, be a defense, for damages caused to her by other vessels engaged in navigation was discussed by Krekel, J., who delivered the opinion, but not decided by the court.